IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| John S. Hensley, | ) | C/A No.: 1:09-1282-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff ("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits. The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards.

I.    Relevant Background

A.    Procedural History

Born October 5, 1958, Plaintiff was 47 as of October 20, 2005, his alleged onset date. Plaintiff filed his application for DIB and SSI on October 20, 2005, initially alleging a disability onset date of July 21, 2003, which he amended at the hearing to October 20,

2005. The application was denied initially and upon reconsideration. At a May 15, 2008 hearing, Administrative Law Judge ("ALJ") Albert A. Reed heard testimony from Plaintiff, his mother Patricia Hensley, and Vocational Expert ("VE") Robert Brabham, Jr. Tr. 505–50. Plaintiff's counsel, Ashley Thompson, was present at that hearing. *Id.* On August 26, 2008, the ALJ issued a decision denying Plaintiff's application for benefits (Tr. 12–27), which the Appeals Council upheld. Tr. 6–8. Plaintiff filed this appeal, requesting reversal of the Commissioner's denial and a remand for an award of benefits or, in the alternative, additional administrative proceedings.

B.     Plaintiff's Background and Medical History

1.     Medical Evidence

On December 5, 2001, Plaintiff was on a job for Terminix looking at his clipboard when he tripped on a defect in a sidewalk. Tr. 127. He fell and landed on his right shoulder and right side of his neck. Tr. 127. In the year following Plaintiff's injury, he experienced right shoulder pain, some neck and interscapular pain, and intermittent pain radiating into his right forearm and hand with hand numbness. Tr. 127. However, both upper and lower extremities continued to have good strength. Tr. 124. An MRI on August 19, 2002 showed that Plaintiff had degenerative disc disease at C3-4, C4-5, and C5-6, and a central herniated nucleus pulposus at C5-6. Tr. 194. In November 2002, Plaintiff indicated he wished to proceed to surgery. Tr. 124. Accordingly, on December 4, 2002, Dr. William B. Naso performed a C5-6 anterior cervical diskectomy and fusion. Tr. 123, 135–136. The surgical procedure was completed without complications. Tr. 123.

Plaintiff made good progress after the surgery. Tr. 155-56. Dr. Naso cleared Plaintiff for light/modified duty as of March 3, 2003, with a restriction against lifting or carrying greater than five pounds. Tr. 155, 210. In March 2003, Plaintiff reported he was working at Terminix. Tr. 319. Through 2004, Plaintiff continued to experience some intermittent pain and discomfort in his neck and right shoulder, including some radicular pain into his arm and some muscle spasms. Tr. 153, 166, 169, 249–50, 444. However, on June 11, 2004, an MRI of Plaintiff's spine showed no evidence of fracture, subluxation, disc herniation, or spinal stenosis, and borderline prominent lymph nodes on both sides of neck. Tr. 228.

On December 3, 2004, Plaintiff was diagnosed with cataracts. Tr. 290–91. The ophthalmologist recommended removal of the cataract in Plaintiff's left eye. Tr. 291. In July 2005, Plaintiff reported he had the cataract removed and could drive again. Tr. 303. In September 2005, he reported the surgery had enabled him to return to work. Tr. 335. Thereafter, Plaintiff had the cataract on his right eye removed and on March 13, 2006, Plaintiff had uncorrected visual acuity of 20/25 in the right eye, 20/25 in the left eye, and 20/35 bilaterally Tr. 342.

On January 12, 2005, Dr. Hudnall W. Paschal treated Plaintiff for the first time for neck and right shoulder pain. Tr. 285. Upon examination, Dr. Paschal found that the neck appeared "okay" and the right shoulder had some tenderness and limited range of motion. Tr. 285. On February 23, 2005, Dr. Paschal referred Plaintiff to Pee Dee Orthopedics. Tr.

283. On April 27, 2005, Dr. Paschal noted that Plaintiff failed to go to Pee Dee Orthopedics. Tr. 282.

On May 19, 2005, Dr. Paschal drafted correspondence which stated (in its entirety):

> John Hensley is a patient of mine that has some medical issues. He has cataracts and is being seen by Stokes Eye Clinic. According to our notes, he has turned in his driver's license. He goes to Mental Health for some psychological problems. He is on some antidepressants. He has also had previous neck surgery. He has had problems with his neck and shoulder. It appears that he is unable to work at this time. Please give consideration and other information [sic] from other doctors.

Tr. 280.

On April 20, 2005, Dr. John J. Kirkland performed a consultative examination. Tr. 253. Plaintiff complained of neck and right shoulder pain, right shoulder numbness, headaches, hypertension, panic attacks, blindness from cataracts, and knee problems. Tr. 253. Plaintiff reported his headaches were relieved with sinus pills and his hypertension was controlled. Tr. 253. Plaintiff complained his knees ached daily and he could only walk about a quarter of a mile before he had to stop because of spasms. Tr. 253. Summarizing his evaluation, Dr. Kirkland noted that Plaintiff's vision was decreased; his hypertension was stable; he had restriction of motion in his neck; an examination of the knees was normal; there existed a question as to rotator cuff injuries to both shoulders; and he had decreased strength of both hands, with grip of only about 3/5. Tr. 255. Finally, Dr. Kirkland noted that Plaintiff "uses a cane to walk and walks with considerable difficulty in the examining room and down the hallway." Tr. 255.

On January 19, 2006, Dr. Dewey Ervin at Mercy Medicine Medical Clinic noted an MRI of Plaintiff's right shoulder showed "some mild impingement but no frank rotator cuff tear." Tr. 442. Dr. Ervin concluded that periodic cortisone injections were the best method for treating Plaintiff's right shoulder. Tr. 442.

On March 13, 2006, Dr. Elizabeth A. Dickinson completed a "comprehensive orthopedic evaluation" of Plaintiff. Tr. 341–44. Plaintiff reported that he had improved since his 2002 spine surgery and had "very little pain" in his neck. Tr. 341. However, Plaintiff stated he had some persistent mild weakness in both lower extremities and his right arm, which was really only noticeable with repetitive use activities, and that prolonged walking increased the sensation of weakness in his legs. Tr. 341. Despite participating in rehabilitation, Plaintiff reported he continued to notice these problems. Tr. 341. Range of motion was limited in the right shoulder, somewhat in his hips, and mildly in his cervical spine. Tr. 343. Left shoulder and hand grip strength was 5/5, and right shoulder and hand grip was 4/5. Tr. 343. Plaintiff reported worsening right shoulder pain and that surgery had been discussed. Tr. 341. Examination of gait revealed weak heel and toe gait, weak "stoop to stand" and weak pivot. Tr. 343. He had a normal tandem gait. Tr. 343.

Dr. Dickinson made the following psychiatric observations: "He is depressed and invasive [sic]. No overt anxiety or agitation. Flattened affect, appropriate speech. No tangential speech or derangement of thought process." Tr. 343. Dr. Dickinson made four diagnoses: status post cervical spine injury; injury to right shoulder; hypertension under

good control; and hyperlipidemia on appropriate medications. Tr. 343–44. In her concluding notes, Dr. Dickinson stated that Plaintiff's "bipolar disorder, anxiety, and depression are also significant contributors to his overall disability to maintain reasonable gainful employment and review of psychiatric records should be done." Tr. 344.

Dr. Rebecca Meriwether, a non-examining state agency medical consultant, completed a physical residual capacity assessment on August 30, 2006. Tr. 355–62. She found that Plaintiff could: occasionally lift 50 pounds; frequently lift or carry 25 pounds; stand/walk about six hours in an eight-hour workday; and perform limited pushing and/or pulling with the upper extremities. Tr. 356. She also found Plaintiff was somewhat limited in his ability to climb ladders, ropes, and scaffolds and had limited ability to reach in all directions with his right arm. Tr. 357–58. On August 2, 2007, Plaintiff was treated at Mercy Medicine Medical Clinic for complaints that his right knee cracked when he walked, and pain in his neck and left shoulder from falling out of a boat backwards. Tr. 440. August 23, 2007, Plaintiff was treated by Dr. Ervin for pain and occasional popping and snapping in his left knee. Tr. 438. Plaintiff reported he had to limp on occasion. Upon examination, Dr. Ervin found some tenderness, but the knee had good stability. Tr. 438. Dr. Ervin concluded that Plaintiff had early degenerative changes in the left knee, but there was no definite indication of meniscal pathology. Tr. 438. On January 27, 2009, about five months after the ALJ rendered his decision, Plaintiff was treated at Mercy Medicine Medical Clinic for pain in his knees and swelling in his legs. Tr. 502.

Plaintiff received mental health treatment since 2001 for panic disorder with agoraphobia, generalized anxiety, and fear of traveling too far from home. Tr. 184–85. Plaintiff has never been hospitalized for psychiatric treatment. Tr. 435. Plaintiff consistently reported no suicidal or homicidal ideations. *See* Tr. 299–340, 445–64. The records demonstrate that Plaintiff was generally better when on prescribed medications. *See* Tr. 300, 305, 309, 314, 319–21, 323, 449, 463. Plaintiff responded well to his prescribed Effexor XR, and to later increased doses of Effexor XR and Cymbalta. Tr. 300, 305, 309, 314, 319-21, 333, 449, 463.

Plaintiff was treated by Dr. James P. Mazgaj at Pee Dee Mental Health Center. On January 21, 2003, Plaintiff reported that after his spine surgery he felt physically better, but mentally worse. Tr. 321. On March 17, 2003, Plaintiff reported he was back working for Terminix and enjoying it. Tr. 319. A few months later, Plaintiff reported he had quit his job at Terminix to work at a friend's pest-control company. Tr. 318. Plaintiff also reported running his own lawn-mowing and landscaping business and running his own car wash business with four employees in 2003. Tr. 317, 315.

On January 20, 2004, Plaintiff reported he was doing "fantastic," was full of energy, and felt his medications were working better. Tr. 314. In 2004, Plaintiff reported the following employment: running his own business detailing cars and working for a company that controlled moisture under houses. Tr. 333, 311.

On March 28, 2005, Plaintiff reported he felt better on an increased dose of Effexor XR, had lots of energy, and planted a one-and-one-half acre garden. Tr. 305. In 2005, Plaintiff reported working in pest control again. Tr. 335.

On May 16, 2005, Plaintiff reported that although he typically only experienced one panic attack a month, he had nine in the prior week. Tr. 304. On September 15, 2005, Plaintiff again reported that he was not doing well, and Dr. Mazgaj indicated he had some depression but it seemed situational. Tr. 300. On December 29, 2005, Plaintiff reported he had an episode of suicidal ideation. Tr. 299. On March 28, 2006 he indicated he was experiencing mood swings and brief visual hallucinations. Tr. 464.

On April 14, 2006, Plaintiff had an isolated auditory hallucination. Tr. 463. He reported he felt worse and was easily brought to tears. Tr. 463. On May 19, 2006, Plaintiff reported he had flunked a drug test which was part of a job application. Tr. 462. he indicated he has had some death wishes. Tr. 462. Dr. Mazgaj advised Plaintiff to get involved in daily activities to distract himself from his situational issues. Tr. 462. On June 28, 2006, Plaintiff reported his sleep was interrupted and he had some visual disturbances, although they may have been related to his cataract surgery or vitreous floaters. Tr. 461. Plaintiff reported he missed working and had been going on job interviews. Tr. 461. He also stated he babysat the two children of his stepdaughter. Tr. 461. On August 3, 2006, Plaintiff denied any real hallucinations. Tr. 460.

On September 14, 2006, Plaintiff reported that he was a little busier and had gone job-hunting. Tr. 459. Plaintiff stated he was going to "start up the garden" soon. Tr. 455.

Plaintiff reported he had a hard time getting through the afternoons and wanted to sleep, partly due to boredom. Tr. 455. Plaintiff reported he sometimes saw nonexistent dogs and mice, but he realized they were not real. Tr. 455. On January 4, 2007, Plaintiff reported feeling very depressed, but reported no suicidal or homicidal ideations. Tr. 457. On May 4, 2007, Plaintiff reported episodes of derealization when outside in his garden that led to increased anxiety and panic. Tr. 454.

On April 16, 2008, Dr. Mazgaj drafted correspondence stating that he did not perform disability determinations or vocational/occupational assessments as part of his practice. Tr. 445.

On August 14, 2006, Dr. Manhal Wieland, a non-examining state agency medical consultant, completed a psychiatric review technique form and a mental residual functional capacity assessment. Tr. 363–80. Dr. Wieland noted a possible bipolar disorder, panic attacks, and a generalized anxiety disorder, but found that Plaintiff's impairments did not meet or medically equal any of the Listings. Tr. 366, 368, 373–74. Dr. Wieland found that Plaintiff's impairments caused mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. Tr. 373. He noted that Plaintiff attended night school four nights a week for two hours, had been going on job interviews, and had been babysitting two children. Tr. 375. Dr. Wieland concluded that while claimant might have some difficulty with complex tasks and detailed instructions, he should be able to perform simple tasks in

a low stress work environment. Tr. 375. Additionally, Dr. Wieland noted that Plaintiff might have difficulty sustaining concentration and pace on complex and detailed instructions, might find work with the general public stressful at that time, but could relate appropriately to supervisors and coworkers. Tr. 379.

At the request of Plaintiff's mother, Dr. Al B. Harley performed a psychiatric evaluation of Plaintiff on January 9, 2007. Tr. 434. Plaintiff had an unkept appearance and a dull affect. Tr. 436. Plaintiff reported that he had occasional auditory hallucinations, and his body told him to do things on occasion, but he resisted. Tr. 436. Plaintiff also reported visual hallucinations which sometimes looked like mice on the floor. Tr. 436. Dr. Harley diagnosed Plaintiff with schizo-affective disorder and depression. Tr. 437. Dr. Harley found Plaintiff's Global Assessment of Functioning Score ("GAF") was 34.[1] Tr. 437. Dr. Harley stated that, from a general psychiatric standpoint, he "would see [Plaintiff] as having major impairment in several areas including family relations, thinking, judgment, and mood." Tr. 437. However, he believed that Plaintiff would be able to receive and manage his own monthly benefit payments. Tr. 437. Finally, Dr.

---

[1]

On page thirteen of his brief, the Commissioner provides the following reference regarding that GAF score: A GAF rating of 31– 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beat up younger children, is defiant at home, and is failing at school)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders-IV-TR 34 (DSM-IV-TR) (Text Revision, 2000).

Harley opined that "[t]his man is very diabled [sic] from an emotional stanpoint [sic]." Tr. 433.

2. Hearing Testimony

a. Plaintiff's Testimony

Plaintiff testified he was born in October 5, 1958, Tr. 509, making him 49 years old at the time of the ALJ's decision. Plaintiff stated he received a high school diploma. Tr. 509. At the hearing, Plaintiff testified that he was employed during 2005. In June 2005, Plaintiff had been running a mobile carwash business for five months. Tr. 514. Plaintiff would hire people to go out and wash cars. Tr. 514. Plaintiff testified that, "I just give it up. I didn't have [the carwash business] not that long because I just couldn't find people that was dependable enough to go out and do it." Tr. 514.

Plaintiff testified that he also worked for three months in 2005 as a salesman for an extermination company. Tr. 514. Plaintiff testified that he "tried" to sell pest control door to door in Myrtle Beach Tr. 514. When the ALJ asked Plaintiff what difficulty he experienced with the door to door sales, Plaintiff responded, "Everything down there is no solicitation. I sold more here than I did down there. So [my boss] was getting mad because I was selling more here than down there, so I said forget it." Tr. 514. Plaintiff testified he "basically" quit his sales job. Tr. 515. Plaintiff added, "I mean this is when the gas was going up to three-something a gallon and I had to drive all the way from Pamplico to the beach everyday." Tr. 515.

Previously Plaintiff worked for Terminix for 14 years. Tr. 515–16. As a sales manager for Terminix, Plaintiff crawled under houses, inspected houses, drove, lifted over 60 pounds, walked and stood all day, carried things, and pushed and pulled things. Tr. 516. In 2002, Plaintiff testified he injured himself while on the job for Terminix. Tr. 518. Plaintiff stated he fell and injured his neck and right shoulder while working at a job site. Tr. 518–19. Plaintiff stated he attempted to rehabilitate the shoulder, but it eventually required surgery. Tr. 520. After surgery, Plaintiff stated that his right arm was "still not right" so he received cortisone shots about once every three months. Tr. 520.[2]

Plaintiff also described the following health-related problems: hypertension, Tr. 520; an inability to lift more than five to ten pounds per arm, Tr. 523; anxiety disorder and panic attacks, Tr. 520; and sleepiness due to his medications, Tr. 523. The ALJ asked Plaintiff what was wrong with his left arm and Plaintiff stated that he did not know, but his doctor wrote up a letter with the restriction around the time of his 2002 surgery. Tr. 528. Plaintiff stated that the heaviest thing he currently lifted was a "cup of Coke." Tr. 529. Plaintiff further stated he had problems with his peripheral vision secondary to cataracts, Tr. 525; pain in his kneecaps, Tr. 523; and pain in his right arm and shoulder which became more severe when he was overly active, Tr. 526. He stated he had a hard time climbing the three stairs to enter his mobile home due to his bad knees. Tr. 511. He testified he had to lie down a couple hours three times per day. Tr. 526.

_____

[2] The record demonstrates that Plaintiff went back to work for Terminix after his injury at least through March 2003. Tr. 319.

Plaintiff testified at length regarding his panic attacks. Plaintiff described his panic attacks as staring into space and basically zoning out. Tr. 520. Plaintiff stated that his panic attacks occurred mostly when he was driving a car, but also when he was a passenger in a car. Tr. 522. While he had a valid driver's license, Plaintiff stated he stopped driving in April 2008 due to his panic attacks. Tr. 512. During a panic attack in April 2008, Plaintiff let his foot off the brake at a light and hit the car in front of him. Tr. 512. Prior to April 2008, he infrequently drove. Tr. 512–13.

The ALJ questioned Plaintiff regarding whether he had difficulty walking. Tr. 528. Plaintiff stated he did experience difficulty, but did not mention the need for any assistive device. Tr. 528. Indeed, Plaintiff testified that he could only sit in one spot for 30 minutes and then became restless and went outside for a walk around his mobile home. Tr. 528. After standing in one spot for 10-to-20 minutes, Plaintiff said he experienced dizziness. Tr. 528. Plaintiff testified that he had been receiving mental health care once a month for five years. Tr. 529. He stated his mental health had not gotten better, but had not worsened. Tr. 529. Plaintiff stated that he felt better for a couple days after his appointments, but the appointments were too brief and mainly focused on the management of medication. Tr. 529–30.

Plaintiff testified he made his own lunch, vacuumed, took out the trash, cleaned up the yard, and watched television. Tr. 531. He stated he did not wash clothes, make beds, read, or listen to the radio. Tr. 531. Plaintiff testified he had no problems feeding himself, bathing, grooming, or dressing, except that his wife picked out his outfits because he was

not good at coordinating clothes. Tr. 532. Also, he stated his wife set out his medication for him. Tr. 534. If he had money, he went shopping for fishing gear. Tr. 533. Plaintiff stated he did not visit friends or relatives because he disliked crowds. Tr. 533. Although he testified going to church about once per month, Plaintiff stated he would get jumpy toward the end of the 45-minute service. Tr. 534. Plaintiff testified that he had no difficulties getting along with other people. Tr. 532. Plaintiff stated that he had problems with his short-term memory and concentration. Tr. 534. He stated that, for example, he would probably not remember the hearing the following day. Tr. 534.

> b.      Plaintiff's Mother's Testimony

Patricia May Hensley, Plaintiff's mother, also testified at the hearing. Tr. 534. Ms. Hensley stated she lived 25 miles from Plaintiff and saw him three or four times per week. Tr. 535–36. She stated they talked twice daily for approximately 10 to 15 minutes. Tr. 536. Ms. Hensley stated that Plaintiff had experienced problems with his short-term memory and had been "very fragile" ever since the accident at Terminix in 2002. Tr. 537. Ms. Hensley stated that she drove Plaintiff to most of his doctor's appointments. Tr. 540. Ms. Hensley was unaware that Plaintiff had been driving as recently as the month before the hearing. Tr. 539. Ms. Hensley testified that she had witnessed Plaintiff having a panic attack. She stated his eyes glazed over and he did not know where he was. Tr. 540–41.

> c.      Vocational Expert Testimony

Robert E. Brabham Jr., a vocational expert, testified at the hearing. Tr. 543. The ALJ asked Mr. Brabham what jobs are available to a person with the following

characteristics and limitations: the individual was limited to light exertional work; had Plaintiff's education and past job experience; could not perform continuous repetitive movement with the right upper extremity; limited to unskilled work in a low stress environment requiring few decisions; no interaction with the public; no ladders, ropes, or scaffolds; occasional reaching overhead with the right dominant arm; and avoidance of hazards, such as unprotected heights and dangerous machinery. Tr. 545. Mr. Brabham responded that jobs consistent with the hypothetical included: light, unskilled work as a machine tender (800,000 positions nationwide and 20,000 positions in South Carolina), as a production inspector (345,000 positions nationwide and 9,000 positions in South Carolina), and as a hand packer or bench hand (375,000 positions nationwide and 10,000 positions in South Carolina). Tr. 545–46.

Plaintiff's attorney then posed the following additional limitations: decreased strength of the dominant hand with only occasional gross and fine manipulation; limited motion in the neck; only occasional bending and stooping; poor concentration resulting in difficulty completing tasks and remembering instructions; and impaired judgment causing difficulty interacting with coworkers and supervisors and exercising any independent judgment. Tr. 546–47. Mr. Brabham stated that the jobs listed would be unaffected by problems with independent judgment. Tr. 548. Further, there were jobs which would allow for only occasional gross or fine manipulation of the dominant hand. Tr. 548. However, Mr. Brabham stated that "if someone has basically no functional ability to interact with other people then that would be very limiting vocationally." Tr. 548. Finally,

Mr. Brabham testified that if an individual was not able to complete a simple one to two-step process for a minimum two-hour block, then the individual could not be gainfully employed. Tr. 548.

### 3. The ALJ's Decision

The ALJ applied the regulatory five step sequential analysis to determine if Plaintiff was disabled. 20 C.F.R. § 404.1520(a)(4). At the first step, the ALJ noted that Plaintiff had not engaged in substantial gainful activity since his amended onset date, October 20, 2005. Tr. 17. The ALJ found at steps two and three that Plaintiff had severe impairments which did not meet or medically equal the requirements of any impairment in the Listing of Impairments, 20 C.F.R. pt., 404, subpt. 14 P, app. 1. Tr. 21. Next, the ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform light and unskilled work in a low stress environment with: no public contact; no continuous repetitive movement with the right upper extremity; no climbing of ladders, ropes or scaffolds; occasional reaching overhead with the right dominant hand; and avoidance of the hazards of unprotected heights or dangerous machinery. Tr. 18. At step four, the ALJ found that Plaintiff could not perform his past work. Tr. 25. At the fifth step, the ALJ relied on the vocational expert's testimony to determine that Plaintiff could perform other work existing in significant numbers in the national economy, and found that Plaintiff was not disabled under the Act. Tr. 26-27.

## II. Discussion

In his brief, Plaintiff argues that the Commissioner's findings are in error for the following reasons:

1)      the ALJ erred by finding Plaintiff retained the residual functional capacity to perform light unskilled work;

2)      the ALJ erroneously discounted the opinions of Plaintiff's treating physician, Dr. Paschal;

3)      the ALJ erroneously discounted the opinions of Dr. Dickinson and Dr. Harley; and

4)      the ALJ erred at Step Five by posing defective hypotheticals to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ's decision is free from error.

A.      ALJ Findings

In his August 26, 2008, decision, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2005.

2.      The claimant has not engaged in substantial gainful activity since October 20, 2005, the amended alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*, 416.920(b)and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: residuals from a neck injury requiring surgery, degenerative joint disease, anxiety and depression (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.936).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light and unskilled work in a low stress environment with no public contact and with no continuous repetitive movement with the right upper extremity; no climbing of ladders, ropes o[r] scaffolds; occasional reaching overhead with the right dominant arm and avoidance of hazards of unprotected heights or dangerous machinery.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on October 5, 1958 and was 47 years old, which is defined as younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.964).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the c1aimant has transferable job skills. (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.   The claimant has not been under a disability, as defined by the Social Security Act from July 21, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17–18, 25–27.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not

disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling (SSR) 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to past relevant work, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to past relevant work. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and

whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); s*ee Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

1.    The ALJ Properly Determined Plaintiff's RFC.

Plaintiff's first allegation of error is that the ALJ did not properly determine his RFC in being able to perform "light work." Plaintiff argues that light work would require

that he be able to walk or stand a total of six hours in an eight hour day, which he argues he cannot do. Plaintiff cites to Dr. Kirkland's consultative vocational rehabilitation examination on April 20, 2005 for support that he was walking with a cane, that his gait was felt to be somewhat shaky, that he walked with considerable difficulty, that he had restriction of motion of his neck, pain in both knees, pain to touch in both shoulders, that there was some question in Dr. Kirkland's mind about rotator cuff injuries, left and right, and decreased strength of Plaintiff's hands with grip of 3/5. Pl.'s Br. 17 (*citing* Tr. 253–55). Plaintiff also cites to the treatment records of Mercy Medicine Clinic for support that he has consistently complained of knee pain as a result of degenerative joint disease in his knees, and developed dependent edema in his legs. Tr. 438–40, 465, 502–04. Plaintiff argues that the degree of limitation in these assessments would be inconsistent with light work and that the case should be remanded for review of his RFC.

Under 20 C.F.R. § 404.1567, "light work" means that Plaintiff could lift no more than 20 pounds at a time and could frequently lift or carry objects weighing up to 10 pounds. A light work job requires a lot of walking or standing, and light jobs performed in the seated position often require the worker to operate hand or leg controls.

The Commissioner argues that, based on the relevant evidence in the record, including medical evidence and Plaintiff's testimony, the ALJ correctly analyzed Plaintiff's physical abilities and found that he was physically capable of light work, reduced by certain non-exertional limitations. Def.'s Br. 18–20. As the Commissioner argues, Dr. Kirkland's April 20, 2005 note appears to be the only reference to Plaintiff's

use of a cane contained within Plaintiff's medical records spanning more than seven years. Def. Br. 19. This assessment was also dated six months before Plaintiff alleges he became disabled. There is no record of a physician prescribing Plaintiff an assistive device or opining he required one, and the vast majority of the medical records after Plaintiff's alleged onset date support the conclusion that Plaintiff does not have difficulty ambulating.

The record also reflects that a few weeks before Dr. Kirkland's examination, Plaintiff had reported to his psychiatrist that he had planted a one-and-one-half acre garden. Tr. 305. Additionally, Dr. Dickinson's March 13, 2006 examination noted that Plaintiff had a normal tandem gait and made no mention that Plaintiff used a cane. Tr. 343.

Plaintiff's own testimony at the ALJ hearing did not mention any need for a cane, and in fact Plaintiff stated that he walks around his trailer, vacuums, takes out the trash, cleans up the trash out of the front yard and back yard, has no difficulty bathing or showering, and goes to Wal-Mart. *See* Tr. 528, 531, 533. The ALJ noted Dr. Kirkland's observation regarding Plaintiff's use of a cane and difficulty walking. Tr. 21. However, when viewing the evidence as a whole, the court finds there is substantial evidence to support the ALJ's conclusion that Plaintiff could perform the walking required in light work.

With respect to Plaintiff's assertion that he has degenerative joint disease of his knee and dependent edema in his legs that would preclude light work, (Pl.'s Br. 17), Dr.

Erwin's record from August 2007 notes only early degenerative changes of Plaintiff's left knee, no definite indication of meniscal pathology, good stability, and no significant edema (Tr. 438). As the Commissioner points out, the only report Plaintiff cites to describe edema is from January 2009, some five months after the ALJ's decision (Tr. 502), which does not provide a basis for reversal.

To the extent that Plaintiff suggests the ALJ should have considered his shoulder condition as precluding light work, the medical records do not reflect a significant issue. Dr. Ervin noted on January 19, 2006 that an MRI of Plaintiff's right shoulder showed only "mild impingement and no frank rotator cuff tear." Tr. 442. Dr. Kirkland's early findings of decreased strength predate Plaintiff's alleged onset date and are not entitled to controlling weight in light of Dr. Dickinson's later examination reflecting full (5/5) left shoulder and hand grip strength, and improved (4/5) right shoulder and hand grip strength. Tr. 343. At any rate, the ALJ included specific restrictions in his RFC finding to account for Plaintiff's right shoulder problem.

The regulations provide that the ALJ shall use treating physicians' opinions on the nature and severity of an impairment, including a plaintiff's RFC, or whether an impairment meets or equals the requirements of a listing, but "the final responsibility for deciding these issues is reserved to the Commissioner," and the ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2) and (3).

Here, the ALJ considered the entire record when he assessed Plaintiff's RFC, and while he is not required to list every specific piece of evidence, *see* 20 C.F.R. §§ 404.1520, 404.1545, the ALJ stated that he considered all of the medical evidence of record, noting that in making the RFC finding:

> I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 an 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

Tr. 18.

The ALJ then evaluated Plaintiff's medical records in a comprehensive seven-page single-spaced analysis. After reviewing the record, the court finds that the ALJ's determination of Plaintiff's RFC is not inconsistent with the medical evidence of record.

The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ met his statutory and regulatory obligation to assess all of the evidence in the record. The court may not reweigh the evidence or substitute its own judgment for the Commissioner's, even if it finds the evidence is susceptible to more than one rational interpretation. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). For the foregoing reasons, the court finds that substantial evidence supports the ALJ's conclusion that Plaintiff retained the RFC to perform a range of light work.

2. The ALJ Properly Discounted the Opinion of Plaintiff's Treating Physician, Dr. Paschal.

Plaintiff's next claim is that the ALJ erred by not giving appropriate weight to the opinion of his treating physician, Dr. Paschal, in which he stated that "[i]t appears that he is unable to work at this time." Pl.'s Br. 17–18, *citing* Tr. 280. Plaintiff argues that Dr. Paschal provided detailed medical records which supported his opinion, that his opinion was not directly contradicted by any other substantial evidence of record, and that the Commissioner failed to comply with 20 C.F.R. §404.1527 in not according adequate weight to Dr. Paschal's opinion.

While Plaintiff claims that Dr. Paschal "provided detailed medical records which supported his opinion" (Pl.'s Br. at 17–18), the record does not support Plaintiff's claim. The records reflect four visits to Dr. Paschal:

1) an evaluation on January 12, 2005 with objective notes reflecting "t]he right shoulder shows some tenderness in the posterior shoulder. Decreased range of motion. Neck appears okay. DTR's[3] 2+ in the upper extremities"; and assessment of shoulder pain and neck pain. (Tr. 285).

2) At a recheck on February 23, 2005, Dr. Paschal's notes reflect that he did not have the reports from x-rays that Plaintiff claimed to have had two weeks prior. His objective notes reflect that Plaintiff "[g]ot decreased range of motion in the right shoulder. Cannot lift it very high. Neurologically otherwise in tact except for his eyes"; and assessment of shoulder pain, blindness and cervicalgia. (Tr. 283).

3) At a recheck on April 27, 2005, Dr. Paschal noted Plaintiff was "[s]till having problems with neck and shoulder. Did not go to Pee Dee Orthopedics and did not call us. I have asked him to please next time if he doesn't make an appointment call us so we can at least call them. Still having problems. He has had chronic problems. Unable to really raise his right arm." His objective notes reflect that Plaintiff has [d]ecreased range

_____

[3] Deep tendon reflexes.

of motion of his shoulder. Neck is supple. DTR's 2+ bilaterally"; and assessment of shoulder and neck pain. (Tr. 282).

4) At Plaintiff's final visit on May 4, 2005, Dr. Paschal noted "[r]ight shoulder revealed no bone or soft tissue abnormalities. The C spine shows post-operative changes otherwise negative study"; and assessment of pre-op for cataract and shoulder pain. Dr. Pascahl noted "Keep appointment with Pee Dee Orthopaedic. Really have nothing else to offer this man as far as his neck."

Tr. 281.

The next note from Dr. Paschal's records was the May 19, 2005 "To Whom It May Concern" letter that stated that it appeared Plaintiff was unable to work at this time. *See* Tr. 280.

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6). However, determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. §

404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance").

The Fourth Circuit has set forth the following considerations for an ALJ when weighing and evaluating medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001)). An ALJ, though, can give a treating physician's opinion less weight "in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court remains mindful that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

After reviewing the record, the court finds that the ALJ appropriately considered Dr. Paschal's opinion as to Plaintiff's disability. The regulations do not require that the ALJ accept an opinion from a treating physician when the physician opines on an issue

reserved for the Commissioner. 20 C.F.R. § 404.1527(e). To the extent that Dr. Paschal's opinion in his May 2005 letter as to Plaintiff's disability is without any explanation as to the impact of Plaintiff's alleged impairments on his ability to work, it is insufficient and not entitled to substantial weight. *Davis v. Shalala*, 31 F.3d 753, 756 (8th Cir. 1994) (finding a recitation of a claimant's medical problems and conclusion that the claimant is unable to work without any explanation as to how the claimant's ailments impeded his ability to work insufficient and not entitled to substantial weight).

The records note that Dr. Paschal is a family physician and that his treatment of Plaintiff consisted of few objective findings during examination, mostly having to do with his complaints of shoulder pain. The records do not reflect that Dr. Paschal made any independent examination of Plaintiff with respect to his psychological problems. The treatment relationship between Dr. Paschal and Plaintiff was limited to four visits over the course of several months, over which time he prescribed some pain medications before determining he could do no more for him. Dr. Paschal's opinion in his "To Whom It May Concern" letter of May 19, 2005 that "[i]t appears that he is unable to work at this time. Please give consideration and other information from other doctors[,]" is not supportable by the record of his own treatment and is not consistent with the record overall.

Dr. Paschal's opinion predated Plaintiff's alleged onset date by five months, and his opinion was based in part on Plaintiff's cataracts, which Plaintiff had surgically removed in July 2005, fewer than two months after Dr. Paschal's opinion. After the

cataract surgery, Plaintiff reported he could drive again (Tr. 303) and return to work (Tr. 335).

Dr. Paschal provided only a very general description of Plaintiff's medical problems and did not provide any information specifically on how Plaintiff's impairments affected his functioning. Even if Dr. Paschal's opinion as to disability were supported by his own treatment records, which it is not, the substantial evidence in the record—including most significantly, Plaintiff's own statements—reflects that Plaintiff was actually working at the time Dr. Paschal opined he was unable to do so. Plaintiff testified at the ALJ hearing that he was running a mobile carwash business for some months as of June 2005 and that later he sold pest control door-to-door. (Tr. 514). The court finds that the ALJ appropriately considered Dr. Paschal's opinion. There is no error on this ground.

3.    The ALJ Properly Discounted the Opinions of Dr. Dickinson and Dr. Harley.

Plaintiff finally argues that the ALJ improperly discounted the opinions of Dr. Dickinson and Dr. Harley who stated that Plaintiff would be unable to perform substantial gainful activity on a sustained basis.

a.    Dr. Dickinson

At the conclusion of her report, Dr. Dickinson stated that Plaintiff's "bipolar disorder, anxiety, and depression are also significant contributors to his overall disability

to maintain reasonable gainful employment and review of psychiatric records should be done." Tr. 344. In discounting Dr. Dickinson's assessment, the ALJ stated the following:

> I have also considered the opinion of Dr. Elizabeth Dickinson that the claimant's mental disorders were significant contributors to the claimant's disability to maintain reasonable gainful employment. However, Dr. Dickinson went on to indicate that review of psychiatric records should be done. It should be noted that Dr. Dickinson's evaluation was primarily and orthopedic evaluation and therefore, I cannot give controlling weight to this opinion of the claimant's disability secondary to mental disorders.

Tr. 25.

Plaintiff alleges the ALJ's characterization of Dr. Dickinson's specialty as orthopedics was erroneous because her specialty is family practice and as a family practitioner, she is just as qualified to give an opinion on mental disorders as she is orthopedic disorders. The Commissioner disagrees and argues that the ALJ properly evaluated Dr. Dickinson's opinion. Def. Br. 22–23.

Dr. Dickinson herself declared that "[t]his is a comprehensive orthopedic examination for allegations Right shoulder and neck pain." Tr. 341. Dr. Dickinson's evaluation does no reveal anything more than a cursory check of Plaintiff's psychiatric symptoms in which she noted only: "He is depressed and invasive. No overt anxiety of agitation. Flattened affect, appropriate speech. No tangential speech or derangement of thought processes." Tr. 343. Dr. Dickinson made no psychiatric diagnoses, and specifically stated that a review of psychiatric records should be done. Tr. 343–44.

To the extent that Dr. Dickinson was basing her opinion on Plaintiff's psychological condition, her opinion was inadequately supported. *See* 204 C.F.R. §

404.1527(d)(3). Further, the regulations and rulings cited by the Plaintiff (Pl.'s Br. at 27), govern treating medical source opinions, and do not apply to Dr. Dickinson's opinion as she was not a treating physician. Only a treating physician's medical opinion is potentially entitled to controlling weight.

Dr. Dickinson's opinion is only a conclusory opinion on an issue reserved to the Commissioner. Dr. Dickinson's one-sentence opinion regarding disability provides no explanation as to how Plaintiff's impairments impact his functioning. For all these reasons, the ALJ properly accorded limited weight to Dr. Dickinson's opinion.

### b.     Dr. Harley

At the request of Plaintiff's mother, Dr. Harley performed a psychiatric evaluation of Plaintiff on January 9, 2007 and provided Plaintiff's attorney with a copy of his report. Tr. 337.  According to a two-sentence document dated January 10, 2007 and entitled "Medical Report," Dr. Harley stated: "This man is very diabled (sic) from an emotional stanpoint (sic).  I would be glad to help in any way by answering questions you may have, Many thanks." Tr. 433. Dr. Harley's psychiatric evaluation dated January 9, 2007 begins with the following objective: "The specific concern in this case is whether this man meets the criteria for Disability based on mental and-or emotional factors."  Tr. 434.  Dr. Harley ends his psychiatric evaluation by stating: "From a general psychiatric standpoint, I would see this individual as having major impairment in several areas including family relationships, thinking, judgment, and mood."  Tr. 437.

In discounting Dr. Harley's assessment, the ALJ stated the following:

I have considered the opinion of Dr. Al Harley dated January 10, 2007, that the claimant is a disabled individual from an emotional standpoint. Dr. Harley apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The claimant reported to Dr. Harley that he had occasional auditory hallucinations; however, there was no mention of this to the treating doctors at Pee Dee Mental Health Center. The record does not contain any opinions from other treating or examining physicians indicating that the claimant has limitations greater than those determined in this decision. Dr. Harley's opinion is based on only one, short session. Therefore, I cannot give Dr. Harley's opinion that the claimant is disabled controlling weight.

Tr. 25.

Plaintiff argues that Dr. Harley's report is supported by the longitudinal record as provided by Pee Dee Mental Health and that mental health disorders are rarely diagnosable by objective findings such that mental health treatment generally relies heavily upon subjective reports of the patient and observations of the patient.

The Commissioner disagrees and argues that the ALJ properly evaluated Dr. Harley's opinion, Def. Br. 23–25, and had multiple reasons for according little weight to his opinion. First, the Commissioner argues Dr. Harley was not a treating physician, so the regulations and rulings that govern treating physician opinions do not apply. The Commissioner argues the ALJ reasonably found that Dr. Harley's opinion was based largely on subjective complaints and was not supported by the longitudinal treatment record, and there is no evidence that Dr. Harley reviewed any of Plaintiff's mental health records. The court agrees.

Dr. Harley offered only a conclusory non-medical opinion on an issue reserved to the Commissioner such that his opinion is not entitled to special significance. *See* 20 C.F.R. § 404.1527(e) (providing determination that a claimant is "disabled" is reserved for the Commissioner); *cf.* 20 C.F.R. § 404.1527(d)(2)(i) (listing "frequency of examination" as factor considered in weighing a medical opinion). Dr. Harley relied entirely upon Plaintiff's reported history and his own observations in one short examination.

Neither does the longitudinal record support Dr. Harley's findings. Dr. Harley suggested that Plaintiff had major impairments in family relations, thinking, judgment, and mood. Nowhere in the record does Plaintiff report any dissonance with family members. According to the testimony of Plaintiff's mother, they were quite close and talked twice daily for 10-to-15 minute. Tr. 536. Plaintiff remained in a caring relationship with his wife as she drove him to appointments, picked out his clothes, and set out his medication for him Tr. 512–13, 532, 534.

Finally, Plaintiff asserts that mental disorders are rarely diagnosable by objective findings. Pl.'s Br. at 20. However, the Act and the regulations recognize the importance of objective findings in evaluating both physical and mental impairments. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 404.1520a.

The court can find no reversible error in the ALJ's findings and conclusions. The medical records fail to reflect any mental impairment of a disabling severity. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[A] psychological disorder is not

necessarily disabling. There must be a showing of related functional loss"). While Plaintiff argues in his brief that Dr. Harley's opinion as to the nature and extent of his impairment during the relevant time period should have been accepted, the ALJ was entitled to base his decision on all of the relevant evidence and record, and adequately explained his rationale for why he reached the decision he did. *See Hays*, 907 F.2d at 1456 (noting it is ALJ's responsibility to weigh the evidence and resolve conflicts in that evidence). The ALJ property assigned his opinion little weight. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (finding it appropriate for ALJ to assign physician's opinion lesser weight when diagnosis based largely upon claimant's self-reported symptoms). The ALJ acknowledged that Plaintiff had mental impairments resulting in some significant limitations, but reasonably found he was not as debilitated to the extreme degree suggested by Dr. Harley. There is no error on this ground.

      4.      The ALJ Properly Evaluated Plaintiff's Ability to Work at Step Five of the Sequential Evaluation Process.

Plaintiff's last allegation is that the ALJ did not properly evaluate Step Five of the Sequential Evaluation Process after determining under Step Four that he could not return to his past relevant work. While the ALJ correctly requested the opinion of a Vocational Expert under Step Five of the Sequential Evaluation process because of the presence of significant nonexertional limitations, Plaintiff argues that the hypotheticals the ALJ posed to the VE were defective.

At Step Five, the Commissioner bears the burden of production to show that work exists in significant numbers in the national economy that Plaintiff could perform. *See* 20 C.F.R. §§ 404.1520, 404.1560(c)(2), 404.1566; *see, e.g., McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983). Based on vocational expert testimony, the ALJ determined that work existed in significant numbers in the national economy that Plaintiff could perform, including as a small parts assembler, electrical assembler, and wire worker. Tr. 35.

In his decision, the ALJ found Plaintiff's RFC "to perform light and unskilled work in a low stress environment with no public contact and with no continuous repetitive movement with the right upper extremity; no climbing of ladders, ropes o[r] scaffolds; occasional reaching overhead with the right dominant arm and avoidance of hazards of unprotected heights or dangerous machinery." Tr. 18.

The first hypothetical question the ALJ asked of the VE follows:

> Assume an individual who's limited to light exertional work as defined in the regulations. And assume an individual of the claimant's education, past job experience with the following restrictions: no continuous repetitive movement with the right upper extremity. The individual is limited to unskilled work, a low stress environment, and that's one I define as requiring few decisions. No interaction with the public. No ladders, no ropes, no scaffolds. Occasional reaching overhead with the right dominant arm.... And avoidance of hazards such as unprotected heights and dangerous machinery.

Tr. 77.

The VE testified that such a hypothetical describes light unskilled work including as (1) a machine tender, which include approximately 20,000 jobs in the South Carolina

economy and in excess of 800,000 nationwide; (2) as production inspector, which include approximately 9,000 jobs in the South Carolina economy and in excess of 345,000 nationwide; and (3) handpacker or bench hand, which include approximately 10,000 jobs in the South Carolina economy and in excess of 375,000 nationwide.

Plaintiff argues that the VE was not given an opportunity to provide answers based upon all of Plaintiff's impairments, specifically the severity of Plaintiff's mental disorders, making the VE's testimony is invalid. Pl.'s Br. 21. In response, the Commissioner argues that the ALJ is not required to include limitations or restrictions in his hypothetical that he finds are not supported by the record, citing to *Lee v. Sullivan*, 945 F.2d 689, 698 (4th Cir. 1991) (finding a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the VE's testimony in response to the question was without support in the record."). The Commissioner argues that the ALJ's decision is supported by substantial evidence.

The court agrees with the Commissioner. In reviewing the record as a whole, the court finds the ALJ's hypothetical appropriately set out all of Plaintiff's impairments as supported by the medical record. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments). As discussed above, the ALJ properly discounted opinions that Plaintiff's mental status precluded him

from working because the opinions were inconsistent with the record medical evidence. There is no error on this ground.

III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's mental and physical conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

August 12, 2010
Florence, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**